PHILLIP D. FOLEY and BECKY SUE FOLEY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Foley v. Commissioner
Docket No. 6901-73
United States Tax Court
T.C. Memo 1976-60; 1976 Tax Ct. Memo LEXIS 346; 35 T.C.M. (CCH) 263; T.C.M. (RIA) 760060; March 3, 1976, Filed *346 Petitioner, a cash basis taxpayer, entered into a separate cattle feeding program in 1970 and 1971. He executed notes and issued a check to cover the expenses expected to be incurred in the following year. Petitioner claimed these expenses as deductions in the year in which the notes and check were issued. Held: Neither the promissory notes nor the check represents payment, with the latter representing merely a refundable deposit. Daniel S. Davisson, for the petitioners. Thomas L. Kummer and Robert Ruwe, for the respondent. STERRETT
MEMORANDUM OPINION STERRETT, Judge: The respondent determined deficiencies in petitioners' federal income taxes for the taxable years 1970 and 1971 in the amounts of $8,947.44 and $27,210.83, respectively. One other adjustment to petitioners' 1971 tax *347 return having been agreed to, the sole remaining issue is whether petitioners are entitled to deduct claimed farm expenses of $15,997.43 and $60,016.88 for the years 1970 and 1971, respectively. All of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. By joint motion of the parties, this case was submitted for decision under Rule 122 of the Court's Rules of Practice and Procedure. Petitioners Phillip D. Foley, M.D. (hereinafter petitioner) and Becky Sue Foley were husband and wife who resided in Middletown, Indiana at the time they filed their petition herein. Petitioners timely filed their joint federal income tax returns for 1970 and 1971 with the district director of internal revenue at Indianapolis, Indiana. These returns were filed utilizing the cash basis method of accounting. Petitioner during the years in issue maintained his medical practice in Middletown, Indiana. He reported a substantial amount of net profit from his practice in each year. On November 23, 1970 petitioner entered into a cattle feeding management program with Univest Management Corporation *348 of Beverly Hills, California (hereinafter Univest). An agreement was executed between these parties to establish the terms of the program. The relevant portions of this agreement read as follows: 1. You [petitioner] plan to engage or are engaged in the business of purchasing, feeding, and selling cattle. In conjunction therewith, you desire to retain the services of Univest in order that your business may be operated more profitably. * *
4. Subject to Cattle Operator's [petitioner's] written instructions to the contrary, Univest is hereby granted a Power of Attorney in the form as attached hereto and incorporated herein. 5. Cattle Operator [petitioner] shall pay to Univest a management fee for all services to be rendered in this program as follows: Upon initial order of One (1) to one hundred (100)head of cattle, a fee of Four Hundred Dollars ($400.00); and an additional fee of Four Dollars ($4.00) per head for all head of cattle ordered over the first one hundred (100). The payment is due in full upon execution of this agreement, and is nonrefundable. The power of attorney referred to above provided in relevant part that: Univest is authorized and empowered *349 to effect loans upon behalf of and in the name of the undersigned for the purpose of financing the purchase of cattle in the name of Phillip D. Foley, d.b.a. P. D. Foley Cattle Company, payment of cost of feeding and care thereof and other costs incurred with respect thereto; to execute notes, security instruments, financing statements and such other instruments as may be necessary, appropriate or required for the consummation of such loans, and for the imposition of liens or security interests on said cattle and feed; to execute such contracts or agreements as may be required with Cattle Purchasers and Feeders selected by Univest for the purpose of purchasing feed, care and ultimate sale of cattle purchased upon behalf of the undersigned; to draw checks and drafts upon the account of the undersigned at selected Bank or Banks for the purpose of payment of all costs and expenses incurred upon behalf of the undersigned, and to endorse the name of the undersigned on all checks or drafts issued to and undersigned for the proceeds of any loan for the aforesaid purposes or for the sale of cattle of the undersigned. In the first part of December, 1970 petitioner sent Univest a check for *350 $4,400 which was used to purchase 100 head of cattle. Univest acknowledged receipt of this check on December 10, 1970. On December 28, 1970 petitioner received an invoice from H & C Investment Company, Inc. (hereinafter H & C) detailing various expenses that were charged to the cattle being held for petitioner's account. This invoice was pursuant to the earlier agreement between petitioner and Univest. It totaled $15,997.43 and included expenses for: Pasture rent
$ 6,400.00
Feed
6,750.00
Labor
1,100.00
Transportation
510.00
Veterinarian supplies and tags
307.43
Management and accounting
930.00
$15,997.43
This invoice was paid by the execution of a note by Univest pursuant to the terms of the above power of attorney. The note was for $16,000 and was dated December 28, 1970. The petitioner was not personally liable for payment of the note, and the lender's recourse was limited to the collateral taken as security for the note which was the items on the invoice. As of the filing of the stipulations, the petitioner has not been required to pay any amount of this note, and the $4,400 check was the only payment of money made by the petitioner to Univest or *351 H & C, an affiliate of Univest, pursuant to the November agreement. In December, 1971 petitioner received a letter and an attached closing statement evidencing the termination of the agreement between himself and Univest. The closing statement reported that the sale proceeds less the purchase price and the previously invoiced expenses resulted in a net loss. The closing statement indicates that the cattle were purchased in January, 1971. In late December, 1971 petitioner inquired into other cattle feeding operations and on December 31, 1971, he entered into a contract with Ohio Feed Lot, Inc. (hereinafter OFL). Under this agreement four lots of cattle were cared for by OFL in 1972 for petitioner. The relevant portions of this agreement are as follows: 2. OFL shall feed the cattle described in Paragraph 1 at South Charleston, Ohio, provided that at or before time of delivery of the cattle, OFL may reject for boarding any cattle of Owner which in OFL's sole opinion does not meet the health and quality standards of OFL. All cattle will be weighed on arrival. 3. OFL shall feed the cattle of Owner accepted by OFL for boarding in accordance with accepted practices of the cattle industry *352 and shall provide veterinary services, medicine and drugs, if needed. 4. Owner shall pay OFL for the feeding services provided herein seven cents (7") per head per day in bi-weekly installments. A down payment equal to approximately two weeks feed bill shall be due and payable in advance at the time of delivery of the cattle to OFL for boarding. In addition, Owner will pay OFL at two week intervals for the cost to OFL of the feed used by Owner's cattle. All rations will be mutually agreed upon by OFL and Owner at time of delivery of the cattle. Owner will also pay a charge of for bedding material used for his cattle and for any drugs and medicine plus five percent (5%). In conjunction with this agreement petitioner sent a check for $20,000 to OFL which was received before December 31, 1971 and on December 30, 1971 he executed a promissory note in favor of OFL for $40,000. On December 31, 1971, $60,016.88 was expended for various feed substances pursuant to the agreement between petitioner and OFL. The first cattle purchased pursuant to this agreement was in March, 1972. During 1972, $44,946.96 of this feed was consumed in the management of petitioner's cattle and the remaining *353 $15,053.04 was sold to OFL at cost. [1]
During 1972 petitioner received various documents reflecting the purchase and management for the four lots of cattle that were purchased pursuant to the agreement. Similar documents were received for each of the four lots purchased. The first document was a statement showing the purchase of the lot and the estimated costs (including feed costs) to be incurred during the feeding period. The charge for the estimated feed cost reduced the principal balance by the $40,000 promissory note executed previously by petitioner. On this statement petitioner received a $5,000 credit towards the payment of these expenses and he executed a promissory note in favor of OFL for the remaining amount. This note was secured by the lot of cattle involved in the above statement. Petitioner received a $5,000 credit and executed similarly secured promissory notes in connection with the other three statements. Petitioner then received invoices that detailed the actual expenses incurred in the management of the lot of cattle. These invoices were followed by a notice that the lot was ready *354 for sale which was followed by closing statements. The closing statements reflected the proceeds received from the sale of the cattle reduced by the purchase price and the actual charges for feed, other costs, and interest. The supporting documents for the closing statements show that the promissory notes were paid and that a $5,000 down payment was returned to petitioner. Petitioner's account was adjusted to reflect the proceeds received from the sale of the unused feed and the final payment on the $40,000 note, and then it was closed with petitioner receiving the remaining funds. Petitioner during the years in issue was a farmer as that term is used in section 1.162-12, Income Tax Regs. Petitioner on his 1970 tax return claimed as deductions those expenses listed previously and an additional $400 as a management and accounting expense. Petitioner on his 1971 tax return claimed as a deduction the $60,016.88 which was charged to his account with OFL for the purchase of feed. The respondent disallowed all of these claimed deductions except for the $400 claimed as an additional management and accounting expense because "it has not been established that *355 such amounts represent ordinary and necessary business expenses or were expended for the purpose designated * * *." The parties have agreed that during the years in issue petitioner was a farmer engaged in the cattle raising business and therefore entitled to deduct those expenses related to this business under the provisions of section 162, [2] Internal Revenue Code of 1954 and section 1.162-12, Income Tax Regs.[3] The controversy here relates only as to whether the petitioner should be allowed to deduct those amounts claimed for feed and other expenses on his 1970 and 1971 tax returns. *356 As a cash basis taxpayer, petitioner argues that these expenses were incurred and paid for in the year in which the deductions were claimed. Petitioner admits that his farming activities represented an attempt to shelter his medical practice income, but as a qualified farmer he asserts that these expenses are properly deductible under section 1.162-12, Income Tax Regs.
Respondent has disallowed the deductions claimed in 1970 taking the position that the petitioner has neither expended nor incurred any obligation to expend any funds for these expenses. Respondent has disallowed the claimed deduction in 1971 maintaining that neither the execution of the $40,000 note in favor of OFL nor the $20,000 check represents payment by petitioner for the feed expense. [4] With respect to the latter item respondent alleges that it is merely a deposit, not made for a business purpose and its deduction would result in a material distortion of petitioner's income in 1971. *357 In November, 1970 petitioner entered into an agreement with Univest the relevant portions of which have been set out above. The agreement required the payment of a nonrefundable management fee of $400. The agreement, however, does not include any provisions with respect to the status of other funds that petitioner might remit. Petitioner subsequently sent Univest a check for $4,400 which was received by Univest in December, 1970. $400 of this amount reflected payment of the above noted nonrefundable management fee. Later that month petitioner received an invoice detailing various expenses, including feed and other costs that were charged to his account. This income was paid through the execution of a note by Univest. Petitioner was not personally liable and he has not been requested to make any payments on the note. Section 1.162-12, Income Tax Regs. allows for the current deduction of the expense items incurred by farmers in carrying on their activity. We certainly agree with petitioner that, despite his tax motives, as a qualified farmer he is entitled to *358 deduct that which the law permits. Cravens v. Commissioner,272 F. 2d 895 (10th Cir. 1959), reversing 30 T.C. 903 (1958). However, the regulations allow deductions for "amounts actually expended" and only "insofar as such costs represent actual outlay." As noted above the expenses charged on the invoice were paid through the execution of a note by Univest to its affiliate H & C. Petitioner was not personally liable on this note and the lender's recourse was limited solely to the items on the invoice. We believe it is well settled that, for a cash basis taxpayer, the issuance of note does not give rise to a deductible expense until the note is paid. Helvering v. Price,309 U.S. 409 (1940), Eckert v. Burnett,283 U.S. 140 (1931), Donald M. Perry,49 T.C. 508 (1968). Petitioner has not been required to make any payments toward the satisfaction of this note. It has been stipulated that petitioner's $4,400 check was the only payment of money made by him to Univest or H & C. We think it is clear that the promissory *359 note does not represent an "actual outlay" of funds entitling petitioner to a deduction which he has claimed. In December, 1971 petitioner entered into a contract with OFL under which four lots of cattle were to be managed in petitioner's behalf. In conjunction with this agreement petitioner issued a check for $20,000 and executed a promissory note for $40,000 to OFL. An invoice detailing the type and cost of various feed substances in the amount of $60,016.88 was then received. During 1972 petitioner received various reports reflecting the progress of this program and reporting the actual costs incurred. Petitioner's claimed deduction has been disallowed by the respondent in two parts. The first part relates to the payment of the feed through the use of the promissory note. The record indicates that payments on this note were first made through the execution of substitute notes as the individual lots of cattle were acquired, and that the substitute notes and the remaining balance of the original note were paid from the proceeds realized from the sale of the cattle all of which occurred in 1972. As discussed previously the execution of a note does not entitle a cash basis taxpayer *360 to a deduction; that must wait until the note is paid. Here the record is clear that no such payments were made during the year in issue. Petitioner compares his situation to one where a taxpayer borrows money and uses those funds to satisfy his creditor using the payment as a basis for his deduction. There is no indication that petitioner has complied with the formality he has asserted is applicable to his situation. Respondent's disallowance with respect to this portion of his determination must be upheld. The issue presented by the second part of respondent's determination is one that has been the subject of several previous cases in which the particular factual pattern of each case was of particular importance. See Mann v. Commissioner,483 F. 2d 673 (8th Cir. 1973) reversing a Memorandum Opinion of this Court, and the cases collected therein and Tim W. Lillie,45 T.C. 54 (1965), affd. per curiam 370 F. 2d 562 (9th Cir. 1966). Commenting on this situation we said in E. Keith Owens,64 T.C. 1, 16 (1975) that "[perhaps] the only eternal guideline or principle that can be gleaned from [these] prior decisions *361 is that each case must be decided in light of its particular facts and circumstances." The facts and circumstances of this case are also subject to careful scrutiny. Although we agree with petitioner that seeking a tax advantage is not forbidden, we believe that a close examination of the contractual terms and their subsequent implementation is justified. Cravens v. Commissioner,supra,272 F. 2d 895 at 898, E. Keith Owens,supra at 16-17. In Mann v. Commissioner,supra, at 678 the court after its review of the earlier cases said that "[the] key to this question is refundability." This test was then incorporated into our decision of E. Keith Owens,supra, and we believe it is applicable in this case. Upon our review of the evidence in this case we believe that the $20,000 check represents a refundable deposit and this factor is fatal to petitioner's cause. The agreement between petitioner and OFL is extremely bare. There are no provisions relating to the type or amount of feed that would be needed, a requirement that petitioner prepay any expenses, or that the cost of these expenses would be fixed. There is also no *362 indication in the record of any need to purchase the feed in advance or that petitioner received any preferential treatment. The invoice does add some specificity to the terms of the agreement in that it lists the various types of feed purchased and their respective costs. However, when the feeding program was completed only approximately $45,000 of the approximately $60,000 purchased feed was used. The remainder was sold to OFL at cost. We also note that the reports furnished to petitioner during 1972 show that he was charged differing amounts for the feed actually used. We believe that the nebulous terms of the contract and the manner in which they were carried out support our conclusion. We also believe that the manner in which the cattle feeding program was financed further confirms our judgment. When the individual lots of cattle were acquired petitioner executed individual notes to cover the expected costs including the feed cost. The cost of the feed was effectively transferred from the original note to the individual notes. These notes were then repaid from the proceeds realized from the sale of the cattle and the sale of the unused feed. On each of the four profit/loss *363 reports petitioner received a $5,000 credit labeled as a return of his down payment. We can only believe that these credits, which total $20,000, represent in reality a return of the funds provided from the $20,000 check issued by petitioner in December, 1971. Petitioner has asserted that a portion of the claimed expenses in 1970 disallowed by respondent will be allowed in 1971. In view of this assertion and the other matter which has been settled, Decision will be entered under Rule 155.
Footnotes
1. These figures amount to only $60,000. See footnote 4, infra↩.
2. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General.--There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *. ↩
3. Sec. 1.162-12 Expenses of farmers. (a) Farms engaged in for profit. A farmer who operates a farm for profit is entitled to deduct from gross income as necessary expenses all amounts actually expended in the carrying on of the business of farming. The cost of ordinary tools of short life or small costs, such as hand tools, including shovels, rakes, etc., may be deducted. The purchase of feed and other costs connected with raising livestock may be treated as expense deductions insofar as such costs represent actual outlay, but not including the value of farm produce grown upon the farm or the labor of the taxpayer.↩
4. Petitioner claimed a deduction of $60,016.88 which has been disallowed. The combination of the check and the promissory note amounts to only $60,000. The slight difference of $16.88 appears to have been ignored by the parties and is not relevant to the ultimate disposition of this case.↩